# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60272
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**
February 4, 2016

Lyle W. Cayce
Clerk

BRENHAM NURSING AND REHABILITATION CENTER,

  Petitioner,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

  Respondent.

Petition for Review of a Decision of the
Department of Health and Human Services
No. A-15-1

Before KING, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:*

Petitioner Brenham Nursing and Rehabilitation Center (Brenham), a skilled nursing facility in Brenham, Texas, seeks review of a final decision of the United States Department of Health and Human Services (DHHS) affirming a civil monetary penalty against it for noncompliance with Medicare participation requirements. For the reasons stated below, we dismiss Brenham's petition for review.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-60272

I

The noncompliance determinations at issue in this appeal arise from Brenham's response to the following incident. On April 12, 2013, two certified nurse assistants (CNA Q and CNA R) discovered that a cognitively impaired 101-year-old resident (Resident 4) had extensive bruising covering much of her body, as well as swelling in some areas. The CNAs reported the bruising to a charge nurse (LVN B), who was "stunned" and immediately informed Brenham's Director of Nursing (DON); LVN B subsequently completed an incident report. The DON told surveyors he initially thought that the bruising was caused by a hematological disorder, but ruled out the possibility after reviewing Resident 4's laboratory results, ordered four days after the bruising was discovered. He then surmised that the bruising was caused by a Hoyer Lift, a device used to transfer debilitated patients. Resting on this causation theory, Brenham's management did not report the bruising to state officials.

State surveyors, inspecting Brenham on behalf of the Centers for Medicare and Medicaid Services (CMS), discovered Resident 4's bruising and the aftermath during a survey that began on April 22, 2013. They reported that Brenham was noncompliant, at an "immediate jeopardy" level, with the following regulations: (1) 42 C.F.R. § 483.13(c), requiring Brenham to "develop and implement" policies to prevent "mistreatment, neglect, and abuse of residents"; (2) 42 C.F.R. § 483.13(c)(2)-(4), requiring Brenham to report and thoroughly investigate suspicions of abuse and neglect; and (3) 42 C.F.R. § 483.75, requiring Brenham to "effectively and efficiently" administer the facility to promote resident well-being. Acting on the surveyors' findings, CMS initially imposed per instance civil monetary penalties (CMPs) totaling $8,500. Five days later, however, CMS rescinded the per instance penalties and replaced them with per-day penalties totaling $84,400.

## No. 15-60272

Brenham filed an administrative appeal challenging both the noncompliance determinations and the resulting CMPs. After a hearing, an administrative law judge (ALJ) upheld CMS's enforcement actions. DHHS's Departmental Appeals Board (DAB) affirmed. Having exhausted its administrative remedies, Brenham timely appealed to this court.[1]

## II

This court has jurisdiction to review the imposition of civil monetary penalties pursuant to 42 U.S.C. § 1320a-7a(e).[2] We conduct our review according to the deferential standards of the Administrative Procedure Act and will uphold "agency actions, findings, and conclusions" unless they are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' or 'unsupported by substantial evidence.'"[3] Additionally, the Secretary's factual findings, "if supported by substantial evidence on the record considered as a whole, shall be conclusive."[4]

## III

Brenham challenges the violations as unsupported by substantial evidence. Alternatively, Brenham contends that CMS's immediate jeopardy findings are clearly erroneous, and further, that the penalty amounts selected within the applicable ranges are unreasonable. Finally, Brenham claims that the increased, per-day penalties arising from CMS's revision of the CMPs violates due process.

---

[1] *See* 42 CFR § 498.95.

[2] 42 U.S.C. § 1320a–7a(e) ("[T]he court shall have jurisdiction of the proceeding and . . . shall have the power to make and enter . . . a decree affirming, modifying, remanding for further consideration, or setting aside, in whole or in part, the determination of the Secretary . . . .").

[3] *Cedar Lake Nursing Home v. U.S. Dep't of Health & Human Servs.*, 619 F.3d 453, 456 (5th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A),(E)).

[4] *Id.* 456 at n.3 (quoting 42 U.S.C. § 1320a–7a(e)).

No. 15-60272

## A

Substantial evidence exists on the record as a whole to support the Secretary's determination that Brenham was not in substantial compliance with 42 C.F.R. § 483.13(c), § 483.13(c)(2)-(4), and § 483.75. Substantial compliance is "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm."[5] We address each noncompliance determination separately.

### 1.    42 C.F.R. § 483.13(c)

Federal law requires skilled nursing facilities to "develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents."[6] Brenham insists on appeal that it substantially complied with § 483.13(c) because there is no evidence of abuse or neglect and it had anti-abuse policies in place, which it implemented through training.

Whether Resident 4's bruising was potentially linked to abuse or neglect is at the heart of this appeal. Brenham claims that it is "uncontested" that Resident 4's bruising was due either to a hematological disorder or pressure from a Hoyer Lift. But Brenham mischaracterizes the record; the surveyor testimony Brenham references only notes that Brenham asserted these theories. Brenham also cites a surveyor worksheet that states "there are no identified concerns" regarding the requirement that residents be "free from unexplained physical injuries" and "resident abuse." But Brenham omits surveyor testimony explaining that the worksheet is prepared on initial rounds and does not represent complete review. As the DAB stated, copious survey

---

[5] 42 C.F.R. § 488.301.

[6] 42 C.F.R. § 483.13(c).

notes "evidence[] . . . clear concern about the unexplained source of the bruising and the potential for abuse."

The ALJ ultimately rejected Brenham's causation theories, deeming them "hypotheses" that were "not grounded in fact." The DAB affirmed, citing the following undisputed evidence: (1) though Resident 4's bloodwork indicated her blood cell counts were slightly low, Brenham's management ruled out a hematological disorder as a possible cause; (2) CNA Q told surveyors that Brenham's DON instructed her to corroborate the Hoyer Lift causation theory, but CNA Q and CNA R nevertheless denied transferring Resident 4 with a Hoyer Lift; (3) LVN B told surveyors that Hoyer Lift equipment was not present in Resident 4's room; (4) Resident 4's care plan did "not address transfers at all, much less call for use of a Hoyer Lift"; and (5) both Resident 4's physician and Brenham's medical director opined that the bruising should have been reported.

Brenham nevertheless contends that the ALJ and DAB improperly discounted its expert testimony supporting Brenham's causation theories. But as the DAB noted, the expert testimony fails to address undisputed record evidence and is, as both the ALJ and DAB noted, often inconsistent with such evidence. We cannot say that the DAB's affirmance of the ALJ's decision to discount the expert testimony was improper.[7] Further, Brenham's Hoyer Lift theory, even if accepted, does not rule out the possibility that staff improperly used the device in an abusive or neglectful manner. We accordingly affirm the DAB's conclusion that Brenham was obligated to treat Resident 4's bruising as

---

[7] *See Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000) ("A finding of no substantial evidence is appropriate only if no credible evidentiary choices . . . support the decision. In applying this standard, we may not re-weigh the evidence or substitute our judgment for that of the Commissioner." (footnote omitted)).

potentially linked to abuse or neglect; substantial evidence indicates the bruising was, at the least, an injury of unknown origin.

This leads us to the further determination that Brenham was not in substantial compliance with § 483.13(c)'s requirement to implement policies to protect residents from abuse and neglect.  In its argument to the contrary, Brenham fails to recognize that "implement" is not limited to training[8] and indeed, as the DAB noted, the cited deficiency was largely grounded in Brenham's failure to effectuate its policies.

Brenham's "Accidents and Incidents" policy, which incorporates state standards regarding suspicions of abuse, requires Brenham to immediately report and investigate suspected neglect or abuse, including "injuries of an unknown source."[9]  As the DAB noted, Brenham's "Facility Abuse Prohibition" policy similarly requires Brenham "to develop and implement a systematic process to investigate allegations of abuse, neglect and/or exploitation so that such events can be accurately and timely investigated and reported to the proper authorities."

It is uncontested that Brenham did not immediately report the injury. Moreover, as explained in further detail in the § 483.13(c)(3) analysis below, the DAB's conclusion that Brenham's "investigation" was cursory and thus far from a "systematic process" is supported by the record, as is the overall conclusion that Brenham failed to protect its residents from possible neglect or

---

[8] *See Honey Grove Nursing Ctr. v. U.S. Dep't of Health & Human Servs.*, 606 F. App'x 164 (5th Cir. 2015) (per curiam) ("[A] policy that exists only on paper provides no benefit to the residents . . . . Procedures which are not carried out in practice are worthless.  Training or other measures to implement a policy can only be understood as sufficient if those measures are calculated to ensure neglect is prevented." (quoting *Life Care Ctr. of Gwinnett*, DAB 2240, 2009 WL 1176324, at *4 (DHHS 2009))).

[9] TEXAS DEP'T OF AGING & DISABILITY SERVS., PROVIDER LETTER #06-43 – GUIDELINES FOR REPORTING INCIDENTS (2007), http://www.dads.state.tx.us/providers/communications/2006/letters/pl2006-43.pdf.

abuse. Brenham's only response is that the policies were not triggered insofar as Brenham "made the reasonable business and professional conclusion" that Resident 4's bruising was not attributable to abuse or neglect or an "injury of unknown origin[]." Because we reject that premise, we affirm the DAB's noncompliance determinations respecting § 483.13(c).

## 2.     42 C.F.R. § 483.13(c)(2)-(4)

Substantial evidence also supports the Secretary's noncompliance findings regarding § 483.13(c)(2)-(4). These provisions provide:

> (2) The facility must ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source . . . are reported immediately to the administrator of the facility and to other officials in accordance with State law . . . .
>
> (3) The facility must have evidence that all alleged violations are thoroughly investigated, and must prevent further potential abuse while the investigation is in progress.
>
> (4) The results of all investigations must be reported to the administrator or his designated representative and to other officials in accordance with State law (including to the State survey and certification agency) within 5 working days of the incident . . . .

Given our conclusion that Resident 4's bruising was, at minimum, an injury of unknown source, and the undisputed fact that Brenham did not timely report the incident or the results of its preliminary investigation, we affirm the DAB's noncompliance determination regarding §§ 483.13(c)(2) and (c)(4)'s reporting requirements.

Regarding § 483.13(c)(3), the ALJ found that "[t]here is no evidence showing" that Brenham "initiate[d] an extensive investigation into the causes of Resident # 4's bruising or even into the extent and seriousness of the resident's injuries." Brenham claims that it "did investigate and take appropriate action."

No. 15-60272

The evidence is largely undisputed; the parties only dispute whether Brenham's "investigation" satisfied § 483.13(c)(3).  The record evidence shows that Brenham prepared a two-page incident report, indicating no suspicion of abuse or neglect, and obtained a one-paragraph statement from CNA Q recounting her discovery of the bruising and subsequent report to LVN B.  The record does not show, as the ALJ and DAB noted, that Brenham coordinated an investigation, interviewed its staff, identified persons with access to Resident 4, or followed up on the possibility of abuse or neglect once its causation theories proved baseless.  Brenham's expert testimony, concluding that Brenham complied with § 483.13(c)(3), does not undercut the DAB's conclusion; it contains only the conclusory assertion that "[a]n investigation was completed and the outcome of that internal investigation indicated the cause of Resident # 4's bruising was from the Hoyer Lift sling, not from any 'unknown origins' or from abuse or neglect."  We note further that a state surveyor did not concede compliance with § 483.13(c)(3) as Brenham claims; rather, the surveyor merely acknowledged Brenham's incident report and the CNA's statement, but noted that she would "have expected them to take it further than that . . . . You know, do a much [sic] thorough investigation."

We conclude that the DAB's conclusion affirming the ALJ's § 483.13(c)(3) noncompliance determination is supported by substantial evidence.

### 3.    42 C.F.R. § 483.75

Finally, Brenham was cited for violating 42 C.F.R. § 483.75, which requires any skilled nursing facility to "be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident."  The ALJ found this deficiency was supported by the lack of reporting and adequate investigation, as well as Brenham's failure to timely notify Resident 4's treating physician or the facility's medical director of the incident.

8

No. 15-60272

As discussed above, there was evidence that the investigation was inadequate. We note that there is some dispute regarding when Resident 4's physician was notified. The incident report prepared on April 12, 2013 states "physician notified," though Resident 4's physician told surveyors he was informed of the bruising eleven days after the bruising's discovery, while the survey was ongoing. Absent evidence to corroborate the incident report, the ALJ found the "physician's own recollection" the "best and most credible evidence." Brenham does not challenge ALJ's determination in this regard and in any event, substantial evidence supports the § 483.75 deficiency.

**B**

Brenham further challenges the resulting CMPs. CMS assessed a $6,600 per-day immediate jeopardy level penalty for the period from April 22, 2013 through April 25, 2013, and a $2,000 per-day non-immediate jeopardy level penalty for the period from April 26, 2013 through May 24, 2013, when CMS concluded that Brenham remedied the violations.

Brenham first argues that the immediate jeopardy findings are clearly erroneous because Resident 4's bruises had begun to heal by the time of the survey. "Immediate jeopardy" is defined as "a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident."[10] The DAB rejected Brenham's argument, concurring in the ALJ's conclusion that the immediate jeopardy determination was not premised on Resident 4's bruising, but rather on Brenham's deficient response to the incident and the resulting risk of future abuse or neglect to Resident 4 and Brenham's other residents. Brenham does not challenge this reasoning and we find no clear error regarding the DAB's conclusion.

---

[10] 42 C.F.R. § 488.301.

No. 15-60272

We further affirm the DAB's conclusion that the penalties selected from the applicable penalty ranges are reasonable. The regulations permit penalties in a range of $3,050 to $10,000 per day for immediate jeopardy level noncompliance and $50 to $3,000 per day for "deficiencies that do not constitute immediate jeopardy, but either caused actual harm, or caused no actual harm, but have the potential for more than minimal harm."[11]   In determining the appropriate penalty, CMS considered, as it must: (1) the facility's history of noncompliance, (2) the facility's financial condition, (3) the factors specified in § 488.404, and (4) the facility's degree of culpability.[12]   The factors in § 488.404 address the scope and severity of the deficiencies and the interrelationship among cited deficiencies.[13]

Relying on the "extremely serious" nature of Brenham's noncompliance as well as its culpability, the ALJ concluded that the CMPs were reasonable under the statutory factors. The ALJ highlighted that Brenham's failures jeopardized not only Resident 4, but also Brenham's other residents. Further, the ALJ noted that Brenham "ignored the possibility of abuse," instead relying on unsupported hypotheses, and cited the undisputed fact that Brenham's DON requested CNA Q to support the Hoyer Lift theory, despite her denial regarding its use. The ALJ concluded that these facts justified the penalties, even crediting Brenham's history of compliance. It further noted that Brenham provided no evidence regarding its financial condition, though CMS provided an opportunity for it to do so. The DAB adopted the ALJ's conclusions.

We conclude that the DAB's determination as to the reasonableness of the CMPs is not arbitrary or capricious or unsupported by substantial

---

[11] 42 C.F.R. § 488.438(a)(1)(i)-(ii).
[12] 42 C.F.R. § 488.438(f).
[13] 42 C.F.R. § 488.404.

No. 15-60272

evidence. Brenham's response, coupled with the effect of that response—the possibility that Brenham residents were exposed to future abuse or neglect with little protection from management—renders the DAB's weighing of the statutory factors reasonable.[14]

## C

In passing, Brenham contends that DHHS's revision of CMPs, increasing the penalties from per-instance fines to per-day fines, violates due process. That DHHS initially imposed a lower, per-instance penalty does not by itself amount to a due process violation.[15]  Nor is it the case that DHHS committed a "taking" merely by its letter notifying Brenham of the increased penalties. That letter did not purport to immediately collect the penalty before a hearing, as Brenham seemingly implies.  Rather, it apprised Brenham of its rights to challenge the CMPs.

Insofar as Brenham claims it was not given adequate notice of the final penalties, CMS's statement of deficiencies provided Brenham with ample notice of the claimed violations, the facts supporting the violations, and the immediate jeopardy findings.  Brenham's due process argument is without merit.

\* \* \*

For the foregoing reasons, we DISMISS Brenham's petition for review.

---

[14] Brenham contends that the rescission of CMPs imposed after a subsequent June 2013 survey is somehow illuminating here.  That those CMPs, based on different facts and a separate survey, were annulled after a dispute resolution process is of no import here.

[15] To the extent Brenham is challenging CMS's choice of remedy—per-instance versus per-day monetary penalties—that is not appealable. 42 C.F.R. § 488.408(g).